**Johnnie L. EDWARDS, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 91–CF–1144.**

District of Columbia Court of Appeals.

Submitted Nov. 19, 1992.
Decided Jan. 8, 1993.

---

1. The government, in this case, requested that we abolish the usable amount requirement.

*Ante* at 32 n. 2.

Joseph H. Green, Washington, DC, appointed by this court, for appellant.

Halsey B. Frank, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Elizabeth Trosman and Heather L. Cartwright, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before ROGERS, Chief Judge, and TERRY and SULLIVAN, Associate Judges.

ROGERS, Chief Judge:

Appellant Johnnie L. Edwards appeals his convictions[1] by a jury on the ground that the trial judge erred in denying his motion to suppress the rifle and his statements to the police. He also contends that there was insufficient evidence to convict him in view of the evidence of self-defense. Finding these contentions unpersuasive, we affirm.

I

At the suppression hearing, the government's evidence showed that two police officers were patrolling in Southeast Washington, D.C., at 2:00 a.m. on September 28, 1990, when they were flagged down by witnesses who told them that a man running down the street had a rifle which he had used to threaten several people in the block and to chase a man named James Booker. The officers drove about seventy-five feet in the direction pointed out to them by the witnesses. There the police observed appellant enter a three-story building carrying a long-barrelled rifle. Officer Buresch announced, "Police officers. Hold on a minute. I want to talk to you." Appellant proceeded into the building. The officers got out of the car and followed him into the building; the latch on the front door had not caught behind appellant.

Officer Buresch observed appellant go up the stairs. He and another officer followed appellant, but they lost sight of him and paused on the second floor landing

---

1. Appellant was convicted of simple assault, D.C.Code § 22–504 (1989 Repl.), carrying a dangerous weapon (a rifle), *id.* § 22–3204, possession of a prohibited weapon (a rifle), *id.* § 22–3214(b), and possession of an unregistered firearm. *Id.* §§ 6–2311, –2376 (1989 Repl.). He was acquitted of possession of a prohibited weapon (a machete). *Id.* § 22–3214(b).

because it was dimly lit. Within a minute, while the officers were waiting for other police officers to arrive and as the backup units arrived, appellant reappeared, walking toward them, without the rifle. One of the officers took hold of appellant's arm and put his handgun back in its holster. The officer then inquired: "Mr. Edwards, where's the gun?" In response to a question whether appellant was free to leave at that point, the officer answered "No. He was being detained in the investigation of the possible weapons or assault charge from the weapon." Appellant's first response to the officer's question was, "I ain't got a gun." The officer then asked him, "Where's the rifle?" and appellant replied, "it ain't a rifle. It's a machete."

Officer Sloan arrived with others as backup. Officer Buresch briefed him on where appellant went when he disappeared with the rifle. Sloan, using a flashlight, then searched the second floor. He began by checking the door of the first apartment he came to and found it was secure, and he proceeded on to the second apartment door, No. 209.[2] He entered apartment 209 because the door was cracked open slightly and he could see a light inside. The apartment was deserted; the plaster was crumbling and there was no furniture except a table with beer cans and drug paraphernalia on it. Sloan saw a light and followed it down a hallway to a bathroom where he saw a rifle on the floor. He called the Crime Scene Search officer, and made no further search. Only minutes had elapsed from the time he had been briefed by Officer Buresch and his partner.

The apartment building, although partially occupied, was not a secure place. Vagrants and others broke into the building frequently. Of the twenty-eight apartments, three or four were occupied. Apartment 209 was not occupied, and appellant, the manager of the building, was not using the apartment to store his belongings.[3] Despite the fact that he had installed a padlock on the outside of the apartment, the padlock was missing on September 28th.

### A

Appellant contends that the trial judge erred by not suppressing the rifle. Assuming, without deciding, that appellant had standing to assert the claim,[4] we find no error by the trial judge because the police actions fall within the exigent circumstances exception.

The officers' entry was proper under the exigent circumstances exception articulated in *Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1646, 18 L.Ed.2d 782 (1967). In that case, witnesses had followed a robber to a specific house. The police searched the house. The Court held that the search was constitutionally permissible because only a "thorough search of the house for persons and weapons could have insured that the defendant was the only man present and that the police had control of all weapons that could be used against them or to effect an escape." *Hayden, supra,* 387 U.S. at 299, 87 S.Ct. at 1646. *See Ruth*

---

**2.** At trial, he testified that No. 209 was the third apartment door he checked, the first two having been locked.

**3.** Appellant testified that he was the caretaker and manager of the apartment building while it was in probate. He lived in apartment 303 and his children and their infant children lived in apartment 304. As property manager, he exercised a great deal of discretion. He could live in any apartment he chose and use apartments to store his belongings. He was the only person who had keys to all of the apartments, and he controlled the security of the building and supervised renovations and renting of the apartments. He testified that the front "entrance

door was shut very tightly. It appeared that it had been broken into."

**4.** The government argued that appellant lacked standing under *United States v. Booth*, 455 A.2d 1351 (D.C.1983), and *Godfrey v. United States*, 408 A.2d 1244 (D.C.1979). *See also Rakas v. Illinois*, 439 U.S. 128, 130–31 n. 1, 99 S.Ct. 421, 424 n. 1, 58 L.Ed.2d 387 (1978); *Lewis v. United States*, 594 A.2d 542, 544 (D.C.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1225, 117 L.Ed.2d 460 (1992). The trial judge ruled, alternatively, that appellant lacked standing, because of the absence of a possessory interest in the premises, to contest the officers' entry and search for the rifle.

*v. United States*, 438 A.2d 1256, 1259 (D.C. 1981).

Here, the police were informed by citizens, including the person assaulted, that appellant had assaulted Mr. Booker with a rifle. The police followed appellant and observed him with the rifle. They identified themselves and asked him to stop. He ignored them. The police had at least reasonable suspicion to follow and detain appellant briefly in order to question him. *See Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984).

In view of what transpired, despite the fact that appellant was standing with some police officers, the situation remained exigent at the time Officer Sloan searched for the rifle. The police had seen appellant walk down the hall with a rifle and then return without the rifle. As a result, the police knew that there was an unattended rifle, which had been used in a recent crime, that could be found by someone else in the building, including a child, and used again to the detriment of the officers or the community. *See Sturdivant v. United States*, 551 A.2d 1338, 1342 (D.C.1988), *cert. denied*, 493 U.S. 956, 110 S.Ct. 370, 107 L.Ed.2d 356 (1989). This provided the officers with the requisite exigency to search for the rifle.

Because Officer Sloan conducted the search in a limited manner, aimed at locating the rifle, and searched only the area that police reasonably believed the rifle was in, the search was permissible. *Id.* at 1343.

### B

Appellant also contends that the trial judge erred by not suppressing his incriminatory statements to the police before he had received his *Miranda*[5] warnings. Although not all *Terry* stops would entitle the person stopped to *Miranda* warnings, *see In re E.A.H.*, 612 A.2d 836, 838 (D.C.

1992) (citing *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984); *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983)), on this record, based on the officer's testimony that he grabbed appellant's arm, reholstered his gun, and that appellant was not free to leave, we agree that appellant was entitled to receive his *Miranda* warnings.[6] *See Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980); *Hairston v. United States*, 500 A.2d 994, 997 (D.C.1985) (" '[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any way' ") (quoting *Miranda v. Arizona*, *supra* note 5, 384 U.S. at 444, 86 S.Ct. at 1612). Nevertheless, although appellant was in custody for *Miranda* purposes at the time he made the statement, we find no error by the trial judge in denying the suppression motion because the police questions were proper under the public safety exception to *Miranda*'s requirements.

Contrary to appellant's contention, the trial judge could reasonably conclude that the police questions, "where's the gun?" and "where's the rifle" were "reasonably prompted by a concern for the public safety," and were necessitated by the presence on the premises of a missing rifle. *See New York v. Quarles*, 467 U.S. 649, 657–59, 104 S.Ct. 2626, 2632–33, 81 L.Ed.2d 550 (1984); *Derrington v. United States*, 488 A.2d 1314, 1328 n. 12 (D.C.1985) (citing *New York v. Quarles*). As in *New York v. Quarles*, *supra*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550, the police here were confronted with a fast-moving situation. Appellant had just threatened a man with a rifle, and the police moved promptly to investigate. They immediately followed appellant, but he ignored their request to stop. They followed him into the building

---

**5.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**6.** Appellant does not challenge the lawfulness of his seizure on the second-floor landing; in his

brief he argues that the police had probable cause to arrest him, and did arrest him, when they stopped him, and therefore, they were required to advise him of his *Miranda* rights.

and lost sight of him. When appellant reappeared moments later, he no longer had the rifle. The police were aware that the building was occupied; it was also relatively accessible to the public. The officers asked "the only question[s] necessary to locate the missing gun before advising [appellant] of his rights." *New York v. Quarles, supra,* 467 U.S. at 659, 104 S.Ct. at 2633. When appellant replied to the first question, "I ain't got a gun," the officer asked, "Where's the rifle?" Appellant now seeks to suppress his incriminating responses.

The police questions were clearly designed to investigate an unsettled situation, and were narrowly directed at ascertaining the location of the rifle and thereby protecting public safety. Consequently, the questioning falls within the public safety exception to the *Miranda* requirements.[7] The fact that the police were on private property, while in *New York v. Quarles,* the police were in a supermarket, is a distinction relied on by appellant that is without significance; some of the apartments in the building where the questioning took place were occupied, vagrants wandered in and out of the building, the building was frequently broken into, and the latch on the front door to the building was not working properly. All of these factors made the building readily accessible.

## II

Appellant's contention, that the evidence was insufficient to convict him because he made an adequate showing of self-defense, is meritless. We view the evidence in the light most favorable to the government. *See Dew v. United States,* 558 A.2d 1112, 1118 (D.C.1989).

The evidence at trial was similar to that presented at the suppression hearing in many respects, but it also explained the relationship between appellant and Mr. Booker. Mr. Booker had come to the apartment building in the early evening to visit Ms. Williamson. He observed appellant standing outside with a gun, and left. He later returned and appellant was gone. The front door of the apartment building was open, but when Mr. Booker could not find Ms. Williamson he went back outside. At that point, appellant leaned out of a window, and, after speaking with Mr. Booker, informed him that Ms. Williamson was with him, doing some work. Mr. Booker reentered the apartment and spoke with Ms. Williamson. Thereafter, Mr. Booker rented an apartment for the night from appellant with the intention of staying with Ms. Williamson; he put some of his clothes in the apartment.

Later that night, according to Mr. Booker, while he was in Ms. Williamson's apartment, appellant knocked on the door and told Ms. Williamson she had ten minutes to vacate the apartment. Ms. Williamson and her children left for her mother's house; Mr. Booker left with her.

Still later, after midnight, when Mr. Booker returned to his rented apartment, he discovered that it was locked. Having been informed by a friend that appellant had removed Mr. Booker's clothes from the apartment, Mr. Booker demanded the return of his clothes and his rental payment. Appellant eventually came outside, carrying a machete. Shortly thereafter, however, he retrieved Mr. Booker's clothes and gave them to him. When he did, Mr. Booker held open the door to the apartment building and asked for the refund of the rent money. Appellant refused, and asked him to release the door; Mr. Booker did not do so. Appellant then ran up the stairs of the apartment building. Mr. Booker chased him to the bottom of the stairs, but thinking that appellant might be going for the gun he had seen earlier, Mr. Booker stopped and went outside and waited. Through a window he saw appellant with a rifle in his hand, holding the rifle across his body at an angle. Appellant and Mr. Booker were only fifteen feet apart. Mr. Booker jumped over the perimeter fence of the building and ran toward Ms. Williamson's

7. Because appellant's defense was that he did not use the weapon against Mr. Booker, although he admitted having a machete and a rifle, any error in admitting his statement was harmless. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

mother's house. Looking back on two occasions, he saw appellant following him and pointing the rifle at him. Mr. Booker flagged down the police. Mr. Booker testified that he thought appellant had assaulted him out of jealousy based on appellant's discovery of a sexual relationship between Mr. Booker and Ms. Williamson.[8]

Appellant offered a different version of events, denying any relationship with Ms. Williamson or that he had evicted her and her children. Rather, he claimed that he had ordered her brother, who was barred from the building, and his friends to leave her apartment. Appellant explained that he had found the machete in the building and why he had kept it, and that he was holding the rifle as collateral for a loan he had made to an antique dealer, who had told him that the rifle dated back to the 1800s.[9]

According to appellant, he had changed his mind about renting to Mr. Booker because Mr. Booker had allowed unauthorized persons into the building and had been using drugs inside the building. When he told Mr. Booker that their deal was off, Mr. Booker became "kind of mad," and started kicking and banging on the front door, cursing and threatening appellant; appellant thought Mr. Booker was high on drugs. Believing that Mr. Booker intended him physical harm, upon returning Mr. Booker's clothes, appellant had only cracked open the front entrance door in order to prevent Mr. Booker from reentering the building. Mr. Booker, however, grabbed the door on the inside and started pushing it so appellant could not close it. In an attempt to appease Mr. Booker, appellant refunded a part of Mr. Booker's rental payment, having already spent some money at a grocery store, and told him to come back tomorrow for the rest. Mr. Booker began to come toward him and appellant, feeling threatened, ran toward

his apartment and deadbolted the lock and called the police.

When he saw Mr. Booker leave the building, appellant went downstairs to lock the front door behind him. After a while, appellant heard banging and a commotion at the front door; he went downstairs and found the police inside the lobby, having forced open the door. To his surprise, the police put appellant against the wall and asked him about the gun. When they asked if he had a weapon, he claimed that he told them that the only thing he had that might be considered a weapon was a machete. The police found the rifle in apartment 209, and arrested appellant.

▪▪ Appellant's right of self-defense at the onset of the encounter did not survive Mr. Booker's flight down the street. *See Potter v. United States,* 534 A.2d 943, 946 (D.C.1987); *United States v. Peterson,* 157 U.S.App.D.C. 219, 228, 483 F.2d 1222, 1231, *cert. denied,* 414 U.S. 1007, 94 S.Ct. 367, 38 L.Ed.2d 244 (1973); *cf. Harper v. United States,* 608 A.2d 152 (D.C.1992). There was no evidence to suggest that appellant, who had locked himself inside his apartment and called the police, could reasonably have believed himself to be in danger from a fleeing man. Hence, his use of armed force was excessive and would defeat his self-defense claim.

▪▪ Appellant's reliance on the middle ground of self-defense, *see Gillis v. United States,* 400 A.2d 311, 313 (D.C.1979), for the proposition that he did not have to retreat, is correct so far as it goes. But the middle ground allows the jury to examine whether the fact that appellant could have retreated indicates that he was not actually in danger, and might have overreacted. *See Carter v. United States,* 475 A.2d 1118 (D.C.1984), *cert. denied,* 469 U.S. 1226, 105 S.Ct. 1222, 84 L.Ed.2d 362 (1985).

---

8. Mr. Booker was impeached with his prior drug convictions and a conviction for burglary and admitted to a pending robbery charge in Pennsylvania. He also admitted using twenty dollars' worth of cocaine on the evening in question.

9. In rebuttal, the government offered expert evidence that the rifle was a Winchester lever-action .30–.30 calibre rifle, carbine, a very popular type of rifle, which was first manufactured in 1898. Based on the serial number of the rifle found in apartment No. 209, an expert witness had determined that the rifle was manufactured in 1958.

Appellant had ample opportunity to develop this defense at trial, but the jury rejected it, apparently crediting Mr. Booker's testimony that appellant had chased him while pointing a rifle at him, a version of events that was corroborated by other witnesses, including two police officers, rather than appellant's explanation of what had occurred.

Accordingly, we affirm the judgments of conviction.