*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CF-919

JONATHAN DAWKINS, APPELLANT,

V.

UNITED STATES, APPELLEE.

FILED 07/26/2018
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(CF1-12634-12)

(Hon. Russell F. Canan, Associate Judge)

(Argued September 20, 2016                    Decided July 26, 2018)

*William Collins*, Public Defender Service, with whom *Samia Fam* and *Jaclyn S. Frankfurt*, Public Defender Service, were on the brief, for appellant.

*Stephen F. Rickard*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *John P. Mannarino*, and *Veronica Sanchez*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN, EASTERLY, and MCLEESE, *Associate Judges*.

EASTERLY, *Associate Judge*: Jonathan Dawkins appeals his conviction for voluntary manslaughter.[1] He argues that the jury was deficiently instructed regarding his claim that he used deadly force in self-defense. Specifically, Mr. Dawkins argues that the trial court erroneously permitted the jury to reject his self-defense claim based on his failure to retreat, before the decedent initiated a fistfight with him, before he (mistakenly) perceived that fight as escalating into a two-on-one attack, and thus before he employed deadly force or had any possible justification (based on a reasonable belief that he was in imminent danger of death or serious bodily injury) to do so. Mr. Dawkins also argues that the trial court compounded the harm of the deficient jury instruction by overruling his objections to the government's similarly impermissible arguments about Mr. Dawkins's ability to retreat. We agree that the trial court's instruction did not give the jury adequate guidance and that this inadequacy was not harmless, particularly in light of the government's closing and rebuttal arguments. Accordingly, we reverse.

---

[1] D.C. Code § 22-2105 (2013 Repl.).

## I.      Facts and Procedural History

This case arises from an encounter between three men previously unknown to one another: the decedent Dwayne Brisbon, Mr. Dawkins, and Daniel Cheek. Certain facts are undisputed. After leaving different bars early one morning, Mr. Dawkins and Mr. Cheek struck up a conversation on the street and decided to walk together to a nearby gas station to buy cigarettes. As they were walking, Mr. Brisbon (who had been in the same bar as Mr. Cheek) drove by, and for reasons that are not clear from the record, stopped to see if Mr. Cheek "was . . . okay." Mr. Cheek reassured Mr. Brisbon that he was "fine" and told Mr. Brisbon, who was making him feel "a little uncomfortable," to "go ahead." But Mr. Brisbon did not leave. At this point, Mr. Dawkins also asked Mr. Brisbon to move on, and an argument developed between the two men. Mr. Brisbon exited his vehicle and went to the back of the car, Mr. Dawkins followed, and there the fight became physical, with Mr. Brisbon throwing the first punch. At some point, Mr. Cheek tried unsuccessfully to get the two men to separate. The fight ended with Mr. Dawkins stabbing Mr. Brisbon in the neck, severing his carotid artery and jugular vein. Mr. Dawkins fled, and Mr. Brisbon returned to his car, drove a short distance, and crashed into a building. Mr. Brisbon bled out before the paramedics arrived.

The government obtained an indictment against Mr. Dawkins for second-degree murder while armed, but it announced on the day of trial that it would only pursue a conviction for voluntary manslaughter while armed.

## A. The Prosecution and Defense Theories and the Evidence at Trial

In its opening statement, the government told the jury that it believed the evidence would show both that Mr. Dawkins "did not actually and reasonably believe that his life was in danger that night[] and that he used excessive force to defend himself." Although the government subsequently disclaimed to the court and defense counsel that it was arguing Mr. Dawkins provoked Mr. Brisbon or "was the first aggressor" "in the technical use of the word," the government highlighted for the jury that Mr. Dawkins, "without any warning, without any provocation . . . aggressively approached the passenger side of Mr. Brisbon's car"; "charged to the back of the car" with Mr. Brisbon "instead of walking away, instead of saying hey, man, I didn't mean anything by it"; and, "after Mr. Brisbon punched him, continued to engage with Mr. Brisbon." Over defense counsel's objection, the government "encourage[d]" the jury "to think . . . of all the things the defendant could have done, rather than engaging Mr. Brisbon." Specifically,

the government urged the jury to consider that Mr. Dawkins "could have walked away. He could have, again, let Mr. Brisbon go. He could have stayed at the side of the car rather than charging to the back at the same time that Mr. Brisbon did."

Through the testimony of Mr. Cheek, its central witness, the government sought to present evidence in support of its narrative. The government elicited testimony from Mr. Cheek that Mr. Dawkins was the first to raise his voice, directing Mr. Brisbon to "move." Mr. Cheek also testified that Mr. Dawkins went over to the passenger's side of the car, leaned into the car, and spoke to the driver in an "aggressive" tone. But much of Mr. Cheek's testimony indicated that Mr. Brisbon and Mr. Dawkins contributed equally to the discord. Mr. Cheek testified on direct that the incident seemed to escalate because of the "energy" coming from both men. He recalled that "[b]oth [men's] voices were pretty loud" and he described both men as "sort of aggressive." He could not hear everything they said, but both men were cursing, saying things like "F you." Mr. Cheek further testified that when Mr. Brisbon "charged out of the car," Mr. Dawkins responded "[i]n a similar way" and met him by the trunk. At that point, the men "were just face-to-face, like chest to chest," and although Mr. Cheek tried unsuccessfully to

pry them apart—"like elevator doors," with "one hand on each" [2]—it "just seemed like they both wanted to fight." Mr. Cheek testified that Mr. Brisbon threw the first punch, and Mr. Dawkins punched back.

Mr. Cheek testified that once the physical fight began, the men appeared evenly matched and that Mr. Dawkins never asked for help or tried to walk away. Mr. Cheek testified that both men exchanged blows for "I don't want to say, 15, 20 seconds"; then, "the smoke cleared," and the men separated. At that point Mr. Cheek saw that Mr. Brisbon was bleeding and Mr. Dawkins had a knife in his hand. It seemed to Mr. Cheek that Mr. Dawkins "was processing everything that had just happened"—"it seem[ed] . . . almost like something overcame him"; according to Mr. Cheek, Mr. Dawkins then "snapped back into reality" and ran from the scene. Mr. Brisbon, seemingly in shock, was walking around holding his neck. Mr. Cheek tried to persuade him to stay where he was, but Mr. Brisbon got back into his car, drove it a short distance, and then crashed the car into a building.

Mr. Cheek's testimony on direct indicated that he tried to separate Mr. Brisbon and Mr. Dawkins before the fight went beyond words. But on cross-

---

[2] Mr. Cheek also tried to defuse the situation by urging them, "Black man, black man. No need to fight."

examination he was impeached with his statement to police, taken the night of the incident, and later adopted under oath in his Grand Jury testimony and admitted at trial as substantive evidence. In this statement, Mr. Cheek told the police that Mr. Brisbon and Mr. Dawkins were already "physically fighting" when he tried to break them up. He further told the police that it was at this point, when the men separated, that he saw that Mr. Dawkins had a knife and that Mr. Brisbon was injured.[3]

---

[3] The only other eyewitness, Justin Harbison, was sitting on his front stoop at the time of the incident (around 12:30 a.m.) and observed the fight illuminated by street lights, from across four lanes of traffic, with cars somewhat blocking his view. He testified that he "saw the punch get thrown"—he could not say by whom—"and then [he] couldn't really tell what happened after that."

The government also presented the testimony of Louis Falls, who testified that he had heard about the stabbing from Mr. Dawkins and that Mr. Dawkins had not said that he was afraid of Mr. Brisbon or that he thought Mr. Brisbon had a weapon. But Mr. Falls's account of the incident—specifically that Mr. Dawkins stabbed Mr. Brisbon immediately after the first punch—did not align with Mr. Cheek's eyewitness account, and his testimony included details (e.g., Mr. Dawkins's post-confession avoidance of Mr. Falls's calls) that were contradicted by documentary evidence (Mr. Dawkins's phone records). Mr. Falls also admitted that he had traded information that Mr. Dawkins purportedly shared with him for the possibility of leniency with respect to his own pending drug charges. (Arguably, this plan was successful; instead of being charged with possession with intent to distribute crack cocaine, carrying a 30-year maximum sentence, he was charged with a 180-day misdemeanor.) And Mr. Falls admitted both that he did not "have a problem lying to the police if it [would] help [him] out of a bad situation," and that he had done so before.

Mr. Dawkins, testifying in his own defense, explained that he was under the misimpression that Mr. Cheek knew Mr. Brisbon—Mr. Brisbon had pulled over to talk to Mr. Cheek and "[t]hey seemed friendly." After Mr. Cheek stepped away from the car, Mr. Dawkins asked Mr. Brisbon for a cigarette. But Mr. Brisbon "got rude immediately . . . [and] said something like, F off or F you." Mr. Dawkins then asked Mr. Brisbon "what the F is your problem" and it "escalat[ed] verbally from there." Mr. Dawkins said he was walking away from the car back to Mr. Cheek when Mr. Brisbon got out of the car and confronted him near the trunk.[4] He thought he heard Mr. Cheek say to Mr. Brisbon "something like [']go ahead, man.[']"[5] When Mr. Brisbon got close enough to Mr. Dawkins, he punched Mr. Dawkins in the throat. The two men then exchanged punches, but at some point, Mr. Dawkins felt someone else grab his left arm from behind, "like they were holding me." Mr. Dawkins looked back and saw it was Mr. Cheek. Mr. Cheek was not holding Mr. Brisbon, and Mr. Dawkins "immediately thought, like, they're about to jump me." Mr. Dawkins testified he "flashed back" to an earlier time when this had happened to him. He and a friend had been attacked and beaten

---

[4] On cross-examination, the prosecutor focused on this stage of the encounter and pressed Mr. Dawkins about his decision not to immediately walk away from Mr. Brisbon and on to the gas station where Mr. Dawkins and Mr. Cheek had planned to buy cigarettes.

[5] Compare *supra* note 2.

unconscious by a group of men; he ended up needing stitches and his friend had to get surgery to repair a broken jaw. He felt he "had to do something immediately to try to get them off of" him. While his left arm was restrained, he pulled a folding knife from his right pocket and swung at Mr. Brisbon. Mr. Dawkins only remembered swinging once, but he acknowledged that Mr. Brisbon had two stab wounds. After he stabbed Mr. Brisbon, Mr. Brisbon walked back to his car, and Mr. Dawkins, still scared, ran.

## B. The Discussions About Jury Instructions

The court and counsel had multiple conversations about how best to instruct the jury about the law of self-defense. Defense counsel's particular concern was the standard instruction in the Criminal Jury Instructions for the District of Columbia, No. 9.503 (5th ed. rev. 2013), which explains that a defendant in this jurisdiction has no duty to retreat before using deadly force, but that a defendant's ability to retreat before using deadly force is a factor that the jury may consider in assessing a self-defense claim.[6] Defense counsel asked that this instruction be

---

[6] The full "Redbook" instruction reads:

> The law does not require a person to retreat or consider retreating when s/he actually and reasonably believes that s/he is in danger of death or serious bodily harm and that deadly

(continued…)

modified to respond to the government's focus on Mr. Dawkins's failure to walk away from Mr. Brisbon before or immediately after Mr. Brisbon punched him, which, defense counsel argued, Mr. Dawkins had no legal obligation to do. Counsel asked the court to distinguish between nondeadly and deadly force and to explain that a defendant's ability to retreat, consistent with his own safety, is not a concern unless and "until [the conflict] escalated to the point of using deadly force."

The government initially objected to any modification, arguing, inter alia, that Mr. Dawkins was attempting "to make this two separate incidents when, in fact, the facts . . . as we believe they came out were that this was one continuous incident where there's this fistfight and during the course of the fistfight, the

---

(…continued)

> force is necessary to repel that danger. But the law does say that a person should take reasonable steps, such as stepping back or walking away, to avoid the necessity of taking a human life, so long as those steps are consistent with the person's own safety. In deciding whether [name of defendant] acted reasonably, you should therefore consider whether s/he could have taken those steps, consistent with his/her own safety.

Criminal Jury Instructions for the District of Columbia, No. 9.503 (5th ed. rev. 2013).

defendant stabs Mr. Brisbon."[7] But after the court expressed concern about juror confusion, the government proposed to modify the standard instruction by adding an introductory sentence: "The law does not require a person to retreat or consider retreating if he actually and reasonably believes it is necessary to use nondeadly force to prevent imminent bodily harm." Although defense counsel's competing proposal likewise incorporated language that there is no duty to retreat in a nondeadly force situation, the defense proposal kept its focus on the use of deadly force and sought to clarify that, in assessing whether a defendant reasonably employed such force, the jury could only consider a defendant's ability to retreat at the time deadly force was used.[8]

---

[7] The government also argued that there might in fact be a duty to retreat before using nondeadly force, but it later abandoned that argument.

[8] The defense proposal replicated language from the standard instruction explaining that there is no duty to retreat in the deadly force context, although a jury may take into account the defendant's ability to retreat in assessing his self-defense claim. It then distinguished a situation where a defendant faced nondeadly force and explained that there is no duty to "take . . . reasonable steps, such as stepping back or walking away prior to using nondeadly force." Lastly, it explained that the jury should "first" consider whether Mr. Dawkins "was authorized to use nondeadly force under the circumstances," and second and "[s]eparately, in deciding whether Mr. Dawkins acted reasonably in using deadly force," the jury "should . . . consider whether he could have taken those steps, consistent with his own safety *after the nondeadly force was used in this case*." (emphases added).

Over Mr. Dawkins's objection, the court adopted the government's modification of the standard instruction, which, the court concluded, "give[s] the defense what it needs to explain [its understanding of the law] during the closing argument."

## C. The "Retreat" Instruction

Pursuant to its conversation with counsel, the trial court instructed the jury:

> The law does not require a person to retreat . . . or consider retreating if he actually and reasonably believes that it is necessary to use nondeadly force to prevent imminent bodily harm.
>
> The law does not require a person to retreat or consider retreating when he actually and reasonably believe[s] that he [i]s in danger of death or serious bodily harm and that deadly force is necessary to repel that danger. But the law does say that a person should take reasonable steps, such as stepping back or walking away to avoid the necessity of taking a human life, so long as those steps are consistent with the person's own safety.
>
> In deciding whether the defendant acted reasonably, you should therefore consider whether he could have taken those steps consistent with his own safety.

## D. Closing Arguments and Verdict

In summation, the government sought to persuade the jury to reject Mr. Dawkins's claim of self-defense. The government explained that an individual acting in self-defense had to reasonably believe he was in imminent danger of death or serious bodily harm. But the government argued that Mr. Dawkins had not actually and reasonably believed he was in such danger. The government highlighted that Mr. Dawkins had been "just as aggressive" as Mr. Brisbon and had "continu[ed] to engage Mr. Brisbon" by going to the back of the car with him and participating in a fistfight. The government further argued that "at the time that Mr. Dawkins decided to take out that knife and stab Mr. Brisbon he wasn't in danger of anything except maybe a couple of bruises from Mr. Brisbon's hands." And the government reread a portion of the instruction about a defendant's ability to retreat. The government emphasized that "the law does say that a person should take reasonable steps, such as stepping back or walking away to avoid the necessity of taking a human life. So long as those are consistent with the person's own safety." The government then argued that Mr. Dawkins could have taken "many other steps aside from using his knife to stab Mr. Brisbon . . . [among them,] Mr. Dawkins could have stopped, punched [Mr. Brisbon] back, walked away."

Counsel for Mr. Dawkins responded in summation that the evidence presented did not disprove his self-defense claim. Counsel took pains to be "absolutely clear about what the law says" about Mr. Dawkins's ability to retreat regarding his claim of self-defense. Counsel explained that it was important for the jury to focus on the correct timeframe, and if the jury did so, the evidence supported Mr. Dawkins's claim of self-defense: it showed that Mr. Dawkins "wasn't in fear for his life until there were [he thought] two people attacking him"; at that point, he stabbed Mr. Brisbon to defend himself; and when Mr. Brisbon stopped punching him and turned away, he took his first opportunity to retreat and run.

But in rebuttal the government returned to its argument that Mr. Dawkins could have avoided the use of deadly force by retreating earlier. The government focused on Mr. Dawkins's failure to walk away at the outset, before the argument got physical:

> And while the defendant doesn't have a duty to back away if he believes that his life is being threatened, he should take reasonable steps before taking a human life. And so even

the defendant himself admitted that *he could have walked in the other direction, towards the gas station.* There were . . .[9]

*He didn't have to walk away. But because he didn't—* because even he admitted—and I almost forgot this—the defendant himself admitted that if it was just him and the driver, it would have been a fair fight. . . .

But the defendant was the one who aggressively went over to the car. . . . *[T]he reason this all starts . . . [was] because of the way the defendant approached the car; it was because of the exchange that occurred between Mr. Brisbon and the defendant. It's because they walked to the back of the car.*

(emphases added).

After deliberating for a full day,[10] the jury found Mr. Dawkins guilty. This appeal followed.

## II. Analysis

Mr. Dawkins challenges the trial court's self-defense instruction in this case on the ground that it erroneously permitted the jury to consider his failure to walk away from Mr. Brisbon at the wrong time—before he employed deadly force or

---

[9] Defense counsel interrupted with an objection, which was overruled by the court.

[10] During this time the jury sent a note expressing uncertainty that it could reach a unanimous verdict. The trial court asked it to continue deliberating.

had any possible justification to do so. To assess whether the trial court's instruction provided the jury with adequate guidance, we must first consider the law of self-defense, in particular how and when a defendant's ability to retreat from conflict can be considered.

## A. The Law of Self-Defense

A successful claim of self-defense overrides the mens rea required to commit the charged crime, and thus makes the defendant's action not criminal. To find a defendant guilty of murder or voluntary manslaughter, the jury must conclude the defendant committed the actus reus of killing with the requisite mens rea. *See Morissette v. United States*, 342 U.S. 246, 251 (1952) (Crime is "a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand"); *Rose v. United States*, 535 A.2d 849, 852 (D.C. 1987) (Generally, "a crime consists in the concurrence of prohibited conduct and a culpable mental state." (quoting 1 WHARTON'S CRIMINAL LAW § 27, at 135 (C. Torcia 14th ed. 1978))).[11] This court has defined that mens rea as some

---

[11] Concurrence has no definitive definition but seems to be understood at times as requiring simultaneity, *see, e.g.*, 1 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 6.3(a) (3d ed.) (discussing *Sabens v. United States*, 40 App. D.C. 440, 444 (1913)), and at other times as requiring "actuation," *id.* at § 1.2(b)

(continued…)

form of malice,[12] *Comber v. United States*, 584 A.2d 26, 35-42 (D.C. 1990) (en banc)), a term of art that encompasses multiple mental states, *id.* at 38-41, that appear to fall within the range of purpose to recklessness, but does not encompass negligence, *see Carrell v. United States*, 165 A.3d 314, 321-22, 324 (D.C. 2017) (en banc) (endorsing the Model Penal Code hierarchy of mens rea terms). If a defendant kills another in lawful self-defense, however, the act, even if purposeful, is deemed to have been committed without malice: "even an intentional killing, if it comports with legally accepted notions of self-defense is not malicious; [instead] it is excused and accordingly no crime at all." *Comber*, 584 A.2d at 41 (internal citation omitted)).

"Where a defendant has presented any evidence that she acted in self-defense, the government bears the burden of proving beyond a reasonable doubt

---

(…continued)
("Generally, it may be said that the defendant's [mens rea] must concur with his [actus reus], in the sense that the former actuate the latter."); *see also id.* at § 6.3(a) (providing examples and noting exceptions).

[12] In the case of voluntary manslaughter, this malice is circumstantially mitigated. *Comber*, 584 A.2d at 38-41; *Jackson v. United States*, 76 A.3d 920, 936 n. 8 (D.C. 2013) ("[V]oluntary manslaughter is not, precisely, a killing without malice aforethought but rather a killing 'with a state of mind which, but for the presence of legally recognized mitigating circumstances, would render the killing murder.'").

that the defendant did not act in self-defense."[13] *Williams v. United States*, 90 A.3d 1124, 1128 (D.C. 2014). The government may carry this burden by showing that a defendant who employed deadly force either did not reasonably believe that she was in imminent danger of death or serious bodily injury,[14] or "used greater force than she actually and reasonably believed to be necessary under the circumstances." *Id.*; *Richardson v. United States*, 98 A.3d 178, 187 (D.C. 2014) (explaining that the defendant "was entitled to an acquittal on th[e] basis [of self-defense] only if the jury concluded (1) that he honestly believed that, when he stabbed [the decedent], he was in imminent danger of serious bodily harm or death, and that he had to use lethal force to save himself from that harm and (2) that both beliefs were objectively reasonable") (emphasis added); *see Ewell v. United States*, 72 A.3d 127, 131 (D.C. 2013) ("[W]here an accused, claiming self-defense, uses deadly force, he must—at the time of the incident—actually believe and

---

[13] However, "where the government proves beyond a reasonable doubt that the defendant was 'the [first] aggressor' or 'provoked the conflict upon herself,' the fact-finder need not even reach the core self-defense inquiry." *Parker v. United States*, 155 A.3d 835, 848 n.26 (D.C. 2017) (citing Criminal Jury Instructions for the District of Columbia, No. 9.504.A). The government did not pursue a legal theory of first aggressor or provocation in this case.

[14] In a nondeadly force case, the government must establish that the defendant did not reasonably believe that she was in imminent danger of bodily injury, as opposed to death or serious bodily injury. *Ewell*, 72 A.3d at 131.

reasonably believe that he is in imminent peril of death or serious bodily harm." (quoting *McPhaul v. United States*, 452 A.2d 371, 373 (D.C. 1982))).

These means of disproving a self-defense claim are available to the government whether a defendant employs nondeadly force or deadly force. *Supra* note 14. But in the deadly force context, this court has acknowledged that a defendant's ability to retreat is a special consideration in assessing the viability of his self-defense claim.[15] *See Gillis v. United States*, 400 A.2d 311, 313 (D.C. 1979). In *Gillis*, this court acknowledged the existence of a common law rule that required an individual who was "threatened with death or serious bodily harm . . . to retreat, if it could be done safely, before using such force." *Id.* at 312. We noted that this "retreat to the wall" rule had been adopted by some states, but others ("probably the majority") had rejected it and had adopted the contrary "American" rule that an individual confronted with death or serious bodily injury "is not required to retreat but may stand his ground and defend himself." *Id.* We sought a "middle ground between the two extremes," balancing a recognition "that,

---

[15] Distinct from this consideration of retreat, our case law recognizes that a defendant who was the first aggressor may regain the ability to claim self-defense if he withdraws in good faith from the conflict he initiated. *See, e.g.*, *Potter v. United States*, 534 A.2d 943, 946 (D.C. 1987); *see also* Criminal Jury Instructions for the District of Columbia, No. 9.504B & C (5th ed. rev. 2013).

when faced with a real or apparent threat of serious bodily harm or death itself, the average person lacks the ability to reason in a restrained manner how best to save himself and whether it is safe to retreat" with a "call[] for some degree of restraint before inflicting serious or mortal injury upon another." *Id.* at 313; *see also Brown v. United States*, 256 U.S. 335, 343-44 (1921) (explaining that the law of self-defense has evolved "in the direction of rules consistent with human nature" and that what "may seem to have been unnecessary when considered in cold blood," may be reasonable "while the heat of the conflict was on, and if the defendant believed that he was fighting for his life").

Accordingly, this court held in *Gillis* that a defendant's failure to retreat, instead using deadly force, is one factor the jury is "allow[ed]" to consider "together with all the other circumstances" in determining if the government has disproved beyond a reasonable doubt that a defendant acted in self-defense. *Gillis*, 400 A.2d at 313; *see also Carter v. United States*, 475 A.2d 1118, 1124 n.1 (D.C. 1984) ("In the District of Columbia, it is recognized that when an individual is faced with a real or apparent threat of serious bodily harm or even death itself, there is no mandatory duty to retreat."); *accord Brown*, 256 U.S. at 343 (holding that in a federal murder prosecution there is no duty to retreat and, instead, that "[r]ationally the failure to retreat is a circumstance to be considered with all the

others in order to determine whether the defendant went farther than he was justified in doing; not a categorical proof of guilt").[16]

The threshold question before us is whether the jury's consideration of a defendant's ability to retreat is temporally limited. Our prior cases have not squarely addressed this question, but they support an affirmative answer. *Gillis* itself indicates that the jury's consideration of a defendant's ability to retreat is limited to the time when deadly force was employed. In that case we said the District's "middle ground" rule regarding consideration of a defendant's ability to retreat instead of using deadly force "permits the jury to determine if the defendant acted too hastily, was too quick to pull the trigger." *See Gillis*, 400 A.2d at 313. Thus we linked the consideration of retreat to the moment the defendant used deadly force. Our self-defense cases subsequent to *Gillis* likewise indicate that the

---

[16] In *Gillis*, we indicated that the ability to retreat is relevant to whether a defendant in fact reasonably believed he was in imminent danger of death or serious bodily harm. *Accord Edwards v. United States*, 619 A.2d 33, 38 (D.C. 1993); *Carter*, 475 A.2d at 1124 n.1 (citing *Gillis*). But other cases, like the Supreme Court's decision in *Brown*, indicate that the ability to retreat is relevant to whether the defendant's use of deadly force was excessive. *Accord Cooper v. United States,* 512 A.2d 1002, 1003 (D.C. 1986) (upholding an instruction that permitted the jury to consider whether, in failing to retreat, the defendant "went further in repelling the danger, real or apparent, than he was justified in doing under the circumstances"). Either way, it is clear that the ability to retreat is relevant to the viability of a self-defense claim in a case where the defendant's use of deadly force is at issue.

fact-finder must focus on the defendant's assessment of his circumstances "at the time of the incident," i.e., at the time deadly force was employed. *See Ewell*, 72 A.3d at 131;[17] *see also Richardson v. United States*, 98 A.3d at 187 (focusing on the time of the stabbing).

The test for self-defense in a deadly force case itself further supports a determination that the jury's consideration of a defendant's ability to retreat has a temporal limit. As noted above, the viability of a self-defense claim turns on whether the government can prove that a defendant did not reasonably believe that he was in imminent danger of death or serious bodily injury, or that he used greater force than he reasonably believed was necessary under the circumstances. An assessment of what the defendant reasonably believed may in turn depend on

---

[17] *Ewell* is a nondeadly force case, but it nonetheless focuses on the moment in time when a defendant acts in self-defense. 72 A.3d at 131—32 (concluding that the trial court's findings were inadequate because "we cannot determine whether, as a matter of law, *when appellant struck* [*the complainant*], he reasonably believed that she posed" such a threat) (emphasis added). *Accord Gay v. United States*, 12 A.3d 643, 648 (D.C. 2011) ("The right of self-defense, and especially the degree of force the victim is permitted to use to prevent bodily harm, is premised substantially on the victim's own reasonable perceptions of what is happening." (quoting *Fersner v. United States*, 482 A.2d 387, 391 (D.C. 1984))); *Edwards*, 619 A.2d at 38 (Rejecting a self-defense claim where defendant pointed a gun at his alleged assailant, Mr. Booker, as Mr. Booker ran away from defendant, observing that defendant's "right of self-defense at the onset of the encounter did not survive Mr. Booker's flight down the street.").

whether retreat was an option. But the only relevant time frame for that inquiry is *after* the actual or apparent danger arose. It is irrelevant that a defendant might have been able to retreat *before* a defendant faced the actual or apparent danger and thus before a defendant might reasonably believe he needed to use deadly force. As it has developed in our jurisdiction, our law of self-defense "calls for some degree of restraint before inflicting serious or mortal injury upon another," *Gillis,* 400 A.2d at 313, but it does not require anticipatory disengagement from every potential interpersonal conflict. The rules of civility do not define the boundaries of self-defense.

Our relevance analysis indicates that the jury's proper temporal focus vis à vis retreat should be the time at which a defendant employs deadly force or had a possible justification to do so. We acknowledge that such a rule at least theoretically expands the jury's consideration of a defendant's ability to retreat beyond the moment deadly force is used, the temporal limit previously suggested by our cases. We surmise that our precedent suggests this temporal limit because typically, as was the case here,[18] the moment when a defendant faces the actual or

---

[18] The circumstance giving rise to a possible justification to use deadly force in self-defense arose in this case when Mr. Dawkins perceived the threat of a two-on-

(continued…)

apparent danger potentially justifying the use of deadly force is virtually simultaneous with the use of deadly force—thus the consideration of a defendant's ability to retreat is limited to that moment. But there may be cases in which there is an appreciable gap between the moment when the defendant perceives the actual or apparent danger potentially justifying the use of deadly force and the moment when defendant actually responds to the perceived danger and employs deadly force.[19] In such cases, the jury may consider the defendant's ability to retreat between these two points in time.

The government does not argue in its brief that the jury was authorized to reject Mr. Dawkins's self-defense claim based on his failure to retreat from Mr. Brisbon before Mr. Dawkins perceived an actual or apparent imminent danger of

---

(…continued)
one attack, a perception which was simultaneous, or nearly so, with his act of stabbing Mr. Brisbon.

[19] Allowing the jury to consider a defendant's ability to retreat at a point in time earlier than he employs deadly force might seem in tension with our general requirement of concurrence, *supra* note 11, but the fact remains that the government still bears the burden to prove that a defendant accused of murder or voluntary manslaughter acted to kill someone and did so with malice or mitigated malice. *Supra* note 12. Self-defense itself is an exception to the rule that guilt is established when the government proves both the actus reus and the mens rea elements of a crime.

death or serious bodily injury.[20]  Instead, the government contemplates a different question—whether a jury assessing the reasonableness of a defendant's use of *deadly* force may consider a defendant's ability to retreat before using *nondeadly* force—and argues that the fact-finder should be permitted to consider whether a defendant could have retreated before using *any* type of force.  This would, in essence, require anticipatory disengagement from every potential interpersonal conflict which, for the reasons discussed above, is not required; furthermore, as the government acknowledges, the weight of authority is to the contrary.  *See* 2 LAFAVE, SUBST. CRIM. L. § 10.4(f) (3d ed.) ("It seems everywhere agreed that one who can safely retreat need not do so before using nondeadly force."); *accord Higgenbottom v. United States*, 923 A.2d 891, 899 n.7 (D.C. 2007); *N. Mariana Islands v. Demapan*, 2008 MP 16, ¶ 22 & n.9 (N. Mar. I. 2008).

The government further argues that the jury was properly instructed on the consideration of retreat and that the government never invited the jury to consider Mr. Dawkins's ability to retreat at a time before he perceived a threat of death or serious bodily harm.  But again we disagree, for the reasons discussed below. *Infra* II.B & C.

---

[20]  To the extent the government indicated at oral argument that it was now advocating this position, this argument comes too late.  *See Scott v. Burgin*, 97 A.3d 564, 565 n.2 (D.C. 2014).

We hold that, in assessing the reasonableness of a defendant's actions in the context of a self-defense claim, and specifically the defendant's ability to retreat, the jury's proper temporal focus is the time at which a defendant employs deadly force or has a possible justification (based on a reasonable belief that he is in imminent danger of death or serious bodily injury) to do so. We acknowledge that consideration of a defendant's earlier actions might be permissible for other purposes, for example, to show that the defendant was the first aggressor, *supra* note 13, or to challenge his credibility.[21] But, for the reasons discussed above, the government may not carry its burden to disprove the reasonableness of a defendant's actions by relying on a defendant's ability to retreat before any actual or apparent need to use deadly force in self-defense arose.

---

[21] *Cf.*, *Bassil v. United States*, 147 A.3d 303, 316—18 (D.C. 2016) (concluding that there was "sufficient evidence for a jury to disbelieve beyond a reasonable doubt that appellant acted in self-defense" as she had testified, noting, inter alia, the "abundant evidence of an acrimonious relationship in which appellant had serious unresolved grievances against [the decedent] that came to a boil in the hours just before their final conflict . . . [which] was more indicative of her motive for stabbing him than fear for her physical safety").

## B. The Trial Court's Instruction

We turn to the trial court's instruction to determine whether it provided the jury with adequate guidance on the law of self-defense and in particular its consideration of Mr. Dawkins's ability to retreat. The government argues that we should review Mr. Dawkins's challenge to the court's instruction for abuse of discretion. None of the cases the government cites for this proposition concern instruction regarding the legal boundaries of a self-defense claim. And even the government's cases acknowledge that the trial court must exercise its discretion so as to deliver an instruction that "considered as a whole, fairly and accurately states the law." *Fearwell v. United States*, 886 A.2d 95, 101 (D.C. 2005).[22] We conclude that the retreat instruction delivered by the trial court did not clearly prohibit the jury from considering conduct that occurred before Mr. Dawkins employed deadly force or had a possible justification to do so.[23]

---

[22] *See also Pannu v. Jacobson*, 909 A.2d 178, 198 (D.C. 2006) ("[I]t is incumbent on the trial court to properly instruct the jury on the law. . . . [T]he trial court *must* give the jury an accurate and fair statement of the law.") (emphasis added).

[23] On appeal, the government focuses on Mr. Dawkins's proposed jury instruction regarding retreat. But Mr. Dawkins's argument is not that his precise instruction should have been given, rather it is that the trial court's instruction was inadequate. *E.g.*, *Whitaker v. United States*, 617 A.2d 499, 507-08 (D.C. 1992) (opinion on rehearing) ("If the language used by counsel in bringing up the subject was considered unsatisfactory, the proper remedy was to reinstruct the jury, but to

(continued…)

The trial court's instruction first informed the jury that there was no *duty* to retreat before using nondeadly force. *Supra* I.C. This instruction directed the jury's attention to the outset of the altercation when Mr. Dawkins had no possible justification to use deadly force in self-defense. Moreover, it told the jury only that there was no *duty* to retreat at this earlier juncture, permitting reasonable jurors to misunderstand that the failure to retreat before using nondeadly force could be considered by the jury to reject Mr. Dawkins's claim that he used deadly force in self-defense at a later time when he stabbed Mr. Brisbon.

The court then continued with the standard instruction No. 9.503. *Supra* I.C. But when coupled with the introductory sentence focusing the jury on an earlier point in time, this language was not clarifying and may well have increased the danger of confusion and misapprehension.[24] After informing the jury that there

(…continued)
do so with greater precision. Even a request for an instruction which is not entirely perfect may in some situations impose upon the court the duty to give a more specific instruction on an issue, where it soundly appears that such an instruction is needful to enable the jury intelligently to determine the question.") (brackets and internal quotation marks omitted).

[24] Mr. Dawkins's challenge to the trial court's instruction, as it was given, is fully preserved, even though, as the government argues, defense counsel did not object to the components of the court's instruction that came from the standard retreat instruction. After the government raised the issue of retreat into the case,

(continued…)

was likewise no duty to retreat before using deadly force, the court told the jury that a defendant "should take reasonable steps, such as stepping back or walking away to avoid the necessity of taking a human life, so long as those steps are consistent with the person's own safety," and then concluded that "[i]n deciding whether the defendant acted reasonably, you should therefore consider whether he could have taken those steps consistent with his own safety." Taking this instruction "as a whole," *Fearwell*, 886 A.2d at 101, a jury could have misunderstood that it "should" consider whether Mr. Dawkins had taken "reasonable steps" to avoid the use of deadly force at any point in his encounter with Mr. Brisbon; that these "reasonable steps" could encompass the time before

---

(…continued)
counsel for Mr. Dawkins made clear that they were concerned that the jury might misunderstand whether and when Mr. Dawkins's ability to retreat from Mr. Brisbon could be considered, and counsel argued to the court that the standard instruction as modified in accordance with the government's proposal did not adequately address its concerns. Counsel's arguments sufficiently alerted the trial court to this issue. *Russell v. United States*, 698 A.2d 1007, 1012 (D.C. 1997) ("[O]bjections to jury instructions must be specific enough to direct the judge's attention to the correct rule of law; a party's request for jury instructions must be made with sufficient precision to indicate distinctly the party's thesis."); *see also Brooks v. United States*, 39 A.3d 873, 881 (D.C. 2012) ("Once an objection is lodged, and its basis asserted, it is the judge's responsibility to exercise judgment in accordance with applicable legal principles.").

It is correct, however, that there is no preserved challenge to the language of the standard instruction, and Mr. Dawkins has not asked us to review that language for plain error; thus, we take no position on whether that language accurately reflects the District's law.

Mr. Brisbon initiated the fistfight; and that Mr. Dawkins's earlier failure to retreat could defeat his self-defense claim, even if at the time he used deadly force in the midst of the fight he reasonably believed he was in imminent danger of death or serious bodily injury.[25]

In short, the trial court failed to "properly instruct the jury on the law," *Pannu*, 909 A.2d at 198, because its instruction did not clearly explain that any consideration of Mr. Dawkins's ability to retreat was temporally limited to the time at which he used deadly force.

## C.    Harm

Having concluded that the trial court's instruction was deficient, we consider if this instruction prejudiced Mr. Dawkins such that we must reverse.  The parties dispute which standard of harm applies.  Mr. Dawkins argues that because the trial court's deficient instruction reduced the government's burden of proof with respect

_____

[25]  The government argues that "the retreat instruction that [the trial court] provided—particularly when combined with the other self-defense instructions and appellant's theory of the case instruction—clearly informed the jury that it could acquit if it found the facts as appellant urged them."  We cannot agree.  We see nothing in these other instructions that limits the jury's consideration of retreat-related facts to the proper timeframe.

to Mr. Dawkins's mens rea, we must determine if the instruction was harmless beyond a reasonable doubt, the standard set forth in *Chapman v. California*, 386 U.S. 18 (1967), for assessing the harm of constitutional error. *Id.* at 24. The government opposes review under *Chapman* and argues that any deficiency in the "wording of jury instructions" is reviewed as non-constitutional error under *Kotteakos v. United States*, 328 U.S. 750 (1946). Under that standard, we must reverse when we "cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Id.* at 765. We need not decide which standard applies because, even under *Kotteakos*, the court's inadequate instruction necessitates reversal.

It was the government's burden to disprove Mr. Dawkins's claim of self-defense. It sought to do so by two means—one permissible under the law of self-defense as we have clarified it in this opinion, the other not. The government permissibly attempted to discredit Mr. Dawkins's narrative that Mr. Cheek had intervened and pulled his arm back in the midst of the fight, causing him to think Mr. Cheek and Mr. Brisbon were acting in concert and giving rise to his fear that he was in imminent danger of death or serious bodily harm. To show that this intervention never happened, the government relied on Mr. Cheek, who testified on

direct that he tried to intervene and stop the fight before Mr. Brisbon threw the first punch, and Mr. Falls, who testified that Mr. Dawkins had stabbed Mr. Brisbon after Mr. Brisbon punched him once. But there were substantial reasons for the jury not to credit either of these witnesses. Mr. Cheek had told the police—inconsistent with his trial testimony but consistent with Mr. Dawkins's recollection and testimony—that he had intervened in the midst of the punching, and he adopted this statement under oath in the grand jury, allowing this statement to come in at trial as substantive evidence. *Supra* I.A. Mr. Falls's narrative contradicted Mr. Cheek's (and Mr. Dawkins's) testimony that the fight lasted fifteen to twenty seconds with both men exchanging punches; in addition, Mr. Falls admitted that he was testifying in hopes of leniency in his own criminal matter, that he would lie if it benefited him, and that he had done so before. *Supra* note 3. A reasonable jury could have credited Mr. Dawkins's and Mr. Cheek's original account of the fight and could have concluded that Mr. Dawkins reasonably employed deadly force in self-defense.

Alternatively, the government suggested throughout trial that Mr. Dawkins's self-defense claim could be rejected because he had not retreated from Mr. Brisbon at the outset of their encounter. In its opening, the government highlighted Mr. Dawkins's "aggressive" manner before the fight began and his failure to "say hey,

man, I didn't mean anything by it," when he "could have walked away." The government questioned its witnesses and Mr. Dawkins in this vein, eliciting testimony from Mr. Cheek that before the fight began, Mr. Dawkins had matched Mr. Brisbon in his aggression and pressing Mr. Dawkins on his failure to walk away from Mr. Brisbon and Mr. Cheek and walk on to the gas station alone. Indeed, the government so strongly insinuated that Mr. Dawkins could not assert a claim of self-defense because he should have retreated well before he believed himself to be in imminent danger of death or serious bodily harm, that Mr. Dawkins's counsel asked the court before closing arguments to modify the standard instruction to clarify that this was not the case.

As discussed, the instruction failed to provide the jury with adequate guidance, and the jury was thus ill-equipped to evaluate the "should have walked away earlier" arguments the government then made in closing and rebuttal. In closing the government not only highlighted that Mr. Dawkins had been aggressive and had "continu[ed] to engage" with Mr. Brisbon by walking to the back of the car and participating in a fistfight, the government also argued that Mr. Dawkins could have taken "many other steps aside from using his knife to stab Mr. Brisbon" including "walk[ing] away" after Mr. Brisbon punched him. Granted, defense counsel strenuously argued that Mr. Dawkins had no obligation to walk away at

these earlier points in time and that the only question under the law was whether he reasonably believed he was in imminent danger of death or serious bodily harm when he stabbed Mr. Brisbon. But counsel's argument was inadequate to counteract the combination of the judge's erroneous instructions and the government's repeated suggestion that the jury could consider Mr. Dawkins's failure to walk away before he had any possible justification to use deadly force. And Mr. Dawkins's counsel could not respond to the government's subsequent rebuttal, directing the jury's attention to Mr. Dawkins's decision to aggressively engage Mr. Brisbon and to "walk[] to the back of the car," and his failure to "walk away," toward the gas station, before the argument became physical—as if these predicate events did, in fact, have legal significance with respect to his later use of deadly force.

The government contends that its questions and arguments implicating Mr. Dawkins's failure to walk away "only made permissible points about [his] state of mind and credibility." As noted above, while there may be other legitimate reasons for the government to highlight a defendant's earlier actions in a conflict involving deadly force, we disagree that a boundless "state of mind" justification is one of them, as it would erase the temporal boundary we clarify with this opinion. Regarding the government's desire to use to Mr. Dawkins's prior conduct within

other permissible limits, we note only that the government did not expressly articulate these limits to the jury and neither did the trial court.

Against the backdrop of Mr. Dawkins's trial, therefore, we cannot say that the court's deficient instruction to the jury was harmless.

### III.    Conclusion

For the reasons set forth above, we reverse Mr. Dawkins's conviction for voluntary manslaughter and remand for a new trial.

*So ordered.*