*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 23-CF-0055

RODNEY HILL ALLEYNE, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2020-CF3-005272)

(Hon. Jason Park, Trial Judge)

(Argued October 3, 2024                    Decided December 5, 2024)

*Jason K. Clark* for appellant.

*David P. Saybolt*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney, and *Chrisellen R. Kolb*, *Nicolas P. Coleman*, *Charles R. Jones*, and *Caroline Huether*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH, EASTERLY, and SHANKER, *Associate Judges*.

SHANKER, *Associate Judge*: Rodney Hill Alleyne appeals a single conviction—robbery—out of a series of convictions stemming from a road rage incident. After a car crash precipitated by Mr. Alleyne's aggressive driving, Mr. Alleyne pulled the other driver—Henry Steven Romero-Guardado—out of his car and took his wallet

from his pants pocket. He then left the scene without returning it. The jury found Mr. Alleyne guilty of robbery, in violation of D.C. Code § 22-2801. Now on appeal, Mr. Alleyne contends that the trial court erred by failing to instruct the jury that (1) he must have intended to permanently deprive Mr. Romero-Guardado of his wallet and (2) such intent must have existed at the moment he took the wallet. He further argues the government put forward insufficient evidence that he intended to steal Mr. Romero-Guardado's wallet.

We conclude that reversal is not warranted on any of Mr. Alleyne's asserted grounds. First, because robbery's intent element is satisfied if the defendant takes the property intending to return it only upon the satisfaction of a condition (e.g., payment of a ransom)—and the evidence was sufficient for the jury to find that Mr. Alleyne possessed that intent—Mr. Alleyne's sufficiency argument fails. Second, under plain-error review, assuming Mr. Alleyne is correct that he must have intended to steal the victim's wallet at the time he took it, the trial court's instructions sufficiently informed the jury of this "concurrence" requirement such that Mr. Alleyne did not suffer harm to his substantial rights. Finally, again under plain-error review, Mr. Alleyne has not shown that any durational error in the trial court's instructions affected his substantial rights. Accordingly, we affirm.

## I. Facts and Procedural History

Because Mr. Alleyne raises both instructional and sufficiency arguments, we describe below both the evidence admitted by the government and select instructional discussions between the trial court and the parties.

### A. The Crash

On a sunny spring day in the District, Mr. Alleyne stopped his car at a red light behind complainant Mr. Romero-Guardado. Once the light turned green, Mr. Alleyne began to honk his car's horn. He then swerved into the right lane, nearly hitting a different vehicle in the process, and pulled even with Mr. Romero-Guardado. Once in view, he "began making [angry] hand gestures" and threw a can at Mr. Romero-Guardado's vehicle, striking either a window or the windshield. Then, after speeding up to pass Mr. Romero-Guardado, Mr. Alleyne swung back into the left lane and, although no cars were in front of him, "slammed" his brakes. At the time Mr. Alleyne applied his brakes, the two cars were approximately three feet apart. Unable to stop, Mr. Romero-Guardado hit Mr. Alleyne's car.

## B.     The Confrontation

Mr. Alleyne exited his vehicle already upset, indeed, "screaming." After approaching Mr. Romero-Guardado's vehicle with, in the words of an onlooking bus driver, "a very aggressive type body language," he "lean[ed] into" Mr. Romero-Guardado's vehicle, still screaming, and jerked Mr. Romero-Guardado's arm to "g[e]t [Mr. Romero-Guardado] out of [his] car." He then got "in [Mr. Romero-Guardado's] face" and yelled that Mr. Romero-Guardado "need[ed] to pay for this." Next, Mr. Alleyne "search[ed]" Mr. Romero-Guardado's pants pockets, removed Mr. Romero-Guardado's wallet, and "tussled" with Mr. Romero-Guardado while securing it. As part of this struggle, Mr. Alleyne tried to take Mr. Romero-Guardado's cell phone, but Mr. Romero-Guardado put it in his underwear. With the wallet in hand, Mr. Alleyne returned to his car and placed it inside. Prior to taking Mr. Romero-Guardado's wallet, Mr. Alleyne never asked for Mr. Romero-Guardado's contact information.

Mr. Alleyne then approached Mr. Romero-Guardado's car anew and began searching through it, opening the front and back doors. Finding a jacket and a mechanic's wrench, he took both from the car. He placed the jacket in his own vehicle alongside Mr. Romero-Guardado's wallet but kept the wrench in his hand.

All the while, he continued yelling that Mr. Romero-Guardado was "going to have to pay for this."

During this confrontation, Mr. Romero-Guardado looked afraid and attempted to back away. He felt "very nervous," like he "was going to cry." Concerned that Mr. Alleyne would take all of his remaining items and his car, Mr. Romero-Guardado gave his cell phone to a man who had pulled over to assist and handed his insurance information and car registration to the onlooking bus driver.[1] Mr. Romero-Guardado also asked both men to call the police, and at least one did.

In the background of this 9-1-1 call, one can hear Mr. Alleyne asking Mr. Romero-Guardado, "What's your name? Where's your phone at?" In addition to these questions, Mr. Alleyne asked Mr. Romero-Guardado to call his insurance company. And Mr. Alleyne would eventually use a phone belonging to Mr. Romero-Guardado's coworker to call the insurance company. The call, for reasons left unclear at trial, was unsuccessful.

At some point, the bus driver called Mr. Alleyne over to the bus in an attempt to calm him down. Mr. Alleyne explained to the driver that "a Latino [person had

---

[1] Mr. Alleyne, shouting expletives, later approached the bus and grabbed the documents Mr. Romero-Guardado had placed therein.

previously hit his vehicle] and he didn't get the vehicle fixed or get any compensation." He went on to say that he "was definitely going to get something today." But Mr. Alleyne cut the conversation short when, according to the bus driver, Mr. Alleyne looked up and noticed the bus's camera.

Throughout this confrontation, Mr. Romero-Guardado repeatedly asked for his possessions back, but Mr. Alleyne declined each time. Instead, Mr. Alleyne indicated that he would give Mr. Romero-Guardado his wallet back if Mr. Romero-Guardado followed him somewhere else. Mr. Alleyne then drove to a nearby gas station, and Mr. Romero-Guardado met him there. Mr. Romero-Guardado repeated his request for his wallet, but Mr. Alleyne again said, "No, follow me. Not here." Mr. Romero-Guardado, fearing for his safety, declined to follow Mr. Alleyne and instead returned to the scene of the crash, where he provided Mr. Alleyne's license plate number to police officers.

### C. The Interview

Several weeks later, police officers interviewed Mr. Alleyne. In the interview, Mr. Alleyne claimed that he told Mr. Romero-Guardado he needed Mr. Romero-Guardado's wallet to be able to contact Mr. Romero-Guardado's insurance company, but Mr. Romero-Guardado did not seem to understand. Mr. Alleyne next asserted that he asked Mr. Romero-Guardado if

Mr. Romero-Guardado could pay for the damage, but Mr. Romero-Guardado said he had no money. Then, Mr. Alleyne explained that he saw Mr. Romero-Guardado's jacket, but he did not explain why he took it. Mr. Alleyne told the interviewing officer that he left the scene to avoid holding up traffic.

Mr. Alleyne went on to admit that he had Mr. Romero-Guardado's wallet and work jacket with him when he left the accident scene. He reiterated his claim that he took the wallet to get in touch with Mr. Romero-Guardado but did not explain how the wallet (or the work jacket and wrench) would help him to do so (but he asserted that he took Mr. Romero-Guardado's wrench due to a fear that Mr. Romero-Guardado or his passenger would hit him with it). Finally, he stated that he threw the wallet away after learning that he could not contact Mr. Romero-Guardado and that Mr. Romero-Guardado "had no money."

### D.    The Trial

A grand jury indicted Mr. Alleyne for robbery, assault, unlawful entry of a motor vehicle, second-degree theft, and leaving after colliding. The case proceeded to a jury trial.

A central issue on appeal involves the trial court's instructions regarding intent. The trial court and the parties discussed a proposed set of jury instructions

prior to closing statements. During this discussion, Mr. Alleyne asked the court to deliver to the jury a lesser-included theft instruction in addition to a robbery instruction. The trial court initially agreed to give the lesser-included theft instruction, but later asked, "How could a jury rationally find . . . that there could be a theft and not a robbery here?" Mr. Alleyne responded that the key difference involved the two offenses' intent elements. Unlike robbery, according to Mr. Alleyne, theft can occur where a defendant "use[s] or deal[s] with the property in such a way as to make it unlikely that the owner will recover it." So, Mr. Alleyne's counsel stated, "the theft could occur when the wallet was not returned because Mr. Alleyne said he threw the wallet away."

The trial court suggested that there is "no distinction in the case law between the deprivation of property elements of the robbery and theft statutes." So, said the trial court, "I don't understand how the jury could rationally conclude that there was a theft and not a robbery." Put differently, the trial court felt that if the jury were to find that Mr. Alleyne took the property intending to return it, Mr. Alleyne might well be not guilty of both offenses.

In response, Mr. Alleyne's counsel stated that if the trial court was set on not providing the lesser-included theft instruction, he would "ask that the specific intent language be added to the robbery [instruction]." "Right now," said defense counsel,

"it just says intending to take it." In saying "it," defense counsel appeared to be referencing the last line in the standard jury instructions regarding the requisite intent for robbery: "It is necessary that [name of defendant] intended to deprive [name of complainant] of his/her property and to take it for his/her own use." Criminal Jury Instructions for the District of Columbia, No. 4.300 (5th ed. 2024). Defense counsel asked to replace the "intended to deprive" language with "took the property without right with specific intent to steal it."

The trial court replied that the standard robbery instruction already contained language similar to that requested by Mr. Alleyne. *See* Criminal Jury Instructions for the District of Columbia, No. 4.300 (5th ed. 2024) ("The government must establish that [name of defendant] had no right to take the property, and that s/he intended to steal it. There can be no robbery if the defendant takes the property for a lawful purpose."). The trial court thus declined to make Mr. Alleyne's requested modification, and Mr. Alleyne did not press the issue anew when the trial court asked if there was "[a]nything further[?]"

After a break, the trial court indicated that it had revisited this court's precedent on lesser-included theft instructions and now agreed with defense counsel that robbery and theft have different mens rea requirements. The trial court explained its understanding that robbery requires "an intent to permanently deprive

a person of property," whereas theft requires "merely [the] intent to appropriate the property inconsistent with the owner's right." The trial court believed the jury could find that Mr. Alleyne possessed the latter intent but not the former; therefore, it agreed to give the lesser-included theft instruction. Mr. Alleyne did not raise any other issues regarding the robbery or theft instructions, and the trial court gave the pattern instructions for both offenses to the jury.

As pertinent here, the jury convicted Mr. Alleyne of one count of robbery under D.C. Code § 22-2801.

## II. Analysis

We begin with Mr. Alleyne's sufficiency argument, then address his contention regarding a "concurrence" requirement, and finally turn to whether the instructions created a risk that the jury would convict Mr. Alleyne even if they believed he intended to deprive Mr. Romero-Guardado of the wallet only temporarily and unconditionally. Where relevant, we will also discuss whether Mr. Alleyne preserved his claims on appeal, and if not, whether those claims survive plain-error review.

## A.      Sufficiency of the Evidence

We review a claim of insufficient evidence de novo, considering "all the evidence in the light most favorable to the verdict [and] according deference to the factfinder to weigh the evidence, determine credibility, and draw justifiable inferences of fact." *Wicks v. United States*, 226 A.3d 743, 746-47 (D.C. 2020) (internal quotation marks omitted).  We affirm if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc) (internal quotation marks and emphasis omitted).

To apply the above standard, we must first identify the elements of robbery. This crime is codified in D.C. Code § 22-2801, which provides, in relevant part:

> Whoever by force or violence, whether against resistance or by sudden or stealthy seizure or snatching, or by putting in fear, shall take from the person or immediate actual possession of another anything of value, is guilty of robbery, and any person convicted thereof shall suffer imprisonment for not less than 2 years nor more than 15 years.

We do not rely on the above statute alone for robbery's elements.  Instead, because robbery in this jurisdiction "retains its common law elements," we turn to case law. *Lattimore v. United States*, 684 A.2d 357, 359 (D.C. 1996).  At common law, robbery is a composite crime—it incorporates the elements of both larceny and

assault. *Id.* Accordingly, to secure a conviction for robbery by force or fear, the government must prove that there was "(1) a felonious taking, (2) accompanied by an asportation [or carrying away], of (3) personal property of value, (4) from the person of another or in his presence, (5) against his will, (6) by violence or by putting him in fear, [and] (7) animo furandi [the intention to steal]." *Id.* (second alteration added and internal quotation marks omitted).

Mr. Alleyne argues that the government's evidence was insufficient to establish the mens rea element for larceny and thus robbery, that is, the intent, or purpose, to steal. To resolve his contention, we first clarify our law regarding robbery's mens rea requirement. We then assess the evidence with this clarified requirement in mind. Ultimately, we conclude that a reasonable jury could have found that Mr. Alleyne possessed the state of mind necessary to commit robbery at the time he took Mr. Romero-Guardado's wallet.

### 1. Purpose to permanently or conditionally deprive

To resolve whether the evidence of Mr. Alleyne's state of mind at trial was sufficient, we must first address what mens rea robbery requires. The parties derive from this court's precedent two—in their view, conflicting—definitions of "intent to steal." We have said in some cases that to commit larceny, a person must possess "the intent to permanently deprive the rightful owner [of property]." *Lattimore*, 684

A.2d at 360 (internal quotation marks omitted); *see also Corbin v. United States*, 120 A.3d 588, 591 n.3 (D.C. 2015); *Durphy v. United States*, 235 A.2d 326, 327 (D.C. 1967). But other cases have criticized this definition. In *Pennsylvania Indemnity Fire Corp. v. Aldridge*, for instance, the court recognized that the common-law crime of larceny requires "specific intent permanently to deprive the owner of his property," but it went on to note that "the old common-law definition of larceny has been largely modified . . . by the courts which purport still to apply the common law." 117 F.2d 774, 775-78 & n.8 (D.C. Cir. 1941) (citing, among other cases, an out-of-jurisdiction precedent holding that "theft of goods with intent to sell them back to the owner" qualifies as larceny).[2] And in *Mitchell v. United States*, the court cited the above language in *Aldridge* to "reject appellants' contention that larceny requires an intent to appropriate property permanently." 394 F.2d 767, 771 (D.C. Cir. 1968).[3]

---

[2] Cases decided by the United States Court of Appeals for the District of Columbia Circuit, and its predecessors, before February 1, 1971, are part of this court's case law. *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971).

[3] Mr. Alleyne seeks to distinguish *Mitchell* and similar cases by arguing that, although those cases recognized that "intent to permanently deprive" need not be interpreted literally, they did so only when interpreting a since-repealed larceny statute. This argument, however, withers in the face of *Aldridge. See* 117 F.2d at 775 (recognizing non-literal interpretations of intent to permanently deprive in the context of the "common-law crime of larceny").

Given the language in the above cases, we do not fault the parties for presenting us with what they view as a binary choice between two distinct intent standards. We, however, do not read our precedent in this manner. In our view, *Aldridge* and *Mitchell* did not approve a departure from the common law but instead recognized a conclusion reached by other courts through the iterative process of common-law reasoning: that "permanently deprive" should not be taken literally. *Cf. Manoukian v. Tomasian*, 237 F.2d 211, 215 (D.C. Cir. 1956) ("It has been said so often as to have become axiomatic that the common law is not immutable but flexible, and by its own principles adapts itself to varying conditions." (quoting *Funk v. United States*, 290 U.S. 371, 383 (1933))); *Fleming v. United States*, 224 A.3d 213, 228 (D.C. 2020) (en banc) ("This court . . . has repeatedly rejected the view that the common law of the District of Columbia was 'frozen' in 1901."). Indeed, the Supreme Court of California—the highest court in another jurisdiction that elaborates on the elements of its robbery statute through common-law reasoning—has reached a similar conclusion to that articulated in *Mitchell* and *Aldridge*. *See People v. Davis*, 965 P.2d 1165, 1169, 1173 (Cal. 1998) ("[T]he general rule is not inflexible: [t]he word 'permanently' . . . is not to be taken literally." (internal quotation marks omitted)).

We need not identify all possible situations in which a person who takes property will satisfy robbery's mens rea requirement. Instead, we hold only that, in

addition to situations where a person's purpose to permanently deprive (in its literal sense) is clear, a person possesses the mens rea necessary to commit common-law larceny—and through it, robbery—when they take property with the purpose to return it only upon the satisfaction of a "condition [they] ha[ve] no right to impose." *E.g.*, *Carter v. Commonwealth*, 694 S.E.2d 590, 595 (Va. 2010) (citing 3 Wayne R. LaFave, *Substantive Criminal Law* § 19.5(b) (2d ed. 2003)).

This understanding of common-law larceny's mens rea requirement has been embraced by sister jurisdictions and scholars alike. The highest courts in California, Virginia, New Jersey, Georgia, Ohio, and Massachusetts have adopted it.[4] Noted commentators Wayne R. LaFave and Jens David Ohlin have endorsed it in their respective treatises. 3 Wayne R. LaFave, *Substantive Criminal Law* § 19.5(b) (3d ed. Oct. 2024 update) ("[I]t is no defense to larceny that the taker intended to return [taken property] only if he should receive a reward for its return, or only upon some

---

[4] *See, e.g.*, *Davis*, 965 P.2d at 1166-67, 1176 (defendant took property from store intending to return it for refund; larceny conviction affirmed); *Carter*, 694 S.E.2d at 592, 594-95 (same); *State v. Hauptmann*, 180 A. 809, 819-20 (N.J. 1935) (defendant took child's pajamas intending to return them as part of ransom demand, larceny conviction affirmed); *Slaughter v. State*, 38 S.E. 854, 855-56 (Ga. 1901) (defendant took jewelry intending to return it for reward; larceny conviction affirmed); *Berry v. State*, 31 Ohio St. 219, 219, 226-27 (1877) (same but with horses); *Commonwealth v. Mason*, 105 Mass. 163, 166-67 (1870) (same as *Berry*). Michigan's intermediate appellate courts have followed these other courts' example. *See People v. Harverson*, 804 N.W.2d 757, 762 (Mich. Ct. App. 2010); *People v. Jones*, 296 N.W.2d 268, 271 (Mich. Ct. App. 1980).

other condition which he has no right to impose." (footnote omitted)); 2 Jens David Ohlin, *Wharton's Criminal Law* § 31:2 (16th ed. Aug. 2024 update) ("An intent to return that is conditional, such as a ransom, is not a defense."). And we ourselves have adopted this understanding when interpreting our jurisdiction's theft offense. *See Price v. United States*, 985 A.2d 434, 437 (D.C. 2009) (citing, among other cases, *Davis*, 965 P.2d at 1175) (concluding that taking an item from a display shelf with the intent to return it for a refund satisfies theft's intent requirement). We now adopt this interpretation in the robbery context: where a person takes property with the intent to return it only upon the satisfaction of a condition they have no right to impose, that person possesses the requisite mens rea for robbery.[5]

---

[5] Courts have offered numerous rationales to support interpreting robbery's intent element in this manner. *See Davis*, 965 P.2d at 1169-77 (cataloguing cases). The Supreme Court of California's explanation, for instance, involves four related rationales: (1) if the condition set by the taker were not met, the deprivation "would in fact have been permanent"; (2) by conditioning the item's return, the taker asserts a right of ownership in the property that constitutes evidence of the taker's intent to permanently deprive; (3) taking property intending to return it only upon the satisfaction of a condition "creates a substantial risk of permanent loss"; and (4) conditioning the item's return necessarily and permanently "deprive[s] the owner of a portion of the value of the property." *Id.* (internal quotation marks and emphasis omitted).

## 2.     Application

We now turn to whether the evidence of intent put forth by the government was sufficient.  For purposes of this analysis, we assume without deciding that, as Mr. Alleyne contends, the government was required to show that he intended to steal Mr. Romero-Guardado's wallet at the moment he took it.[6]  Because Mr. Alleyne's behavior throughout his interactions with Mr. Romero-Guardado supports the conclusion that he took Mr. Romero-Guardado's wallet with the intent to hold it effectively for ransom, Mr. Alleyne's sufficiency argument fails.

We begin with Mr. Alleyne's contemporaneous, incriminating statements. From the beginning of the incident, Mr. Alleyne yelled that Mr. Romero-Guardado "needed to pay."  Mr. Alleyne then told an onlooking bus driver that he "was definitely going to get something *today*."  A reasonable factfinder could interpret

---

[6] In an effort to demonstrate that a robbery conviction can be sustained even in the absence of such concurrence, the government suggests that "robbery continues as long as the asportation," relying primarily on felony-murder cases.  Though we are skeptical of the government's position, *see Brown v. United States*, 35 App. D.C. 548, 552-58 (D.C. Cir. 1910) (rejecting a continuing-trespass theory of larceny), we adhere to our oft-reemphasized policy of judicial restraint: courts "should not decide more than the occasion demands."  *District of Columbia v. Wical Ltd. P'ship*, 630 A.2d 174, 182 (D.C. 1993) (internal quotation marks omitted).  As we can affirm Mr. Alleyne's convictions without resolving whether and to what extent robbery requires concurrence, we leave that question for another day.

these statements to suggest that Mr. Alleyne wanted payment immediately and took the wallet to ensure he would get it.

Next, Mr. Alleyne engaged in conduct inconsistent with his stated explanation for his actions—that he wanted to make sure he had Mr. Romero-Guardado's contact information. He wrested Mr. Romero-Guardado's wallet from his pocket without first asking for Mr. Romero-Guardado's information. He then took two of Mr. Romero-Guardado's possessions—a jacket and a wrench—that had no relevance to contact information. Even after seeing Mr. Romero-Guardado's insurance information and calling the number listed, he declined to return Mr. Romero-Guardado's possessions. Instead, Mr. Alleyne said that he "threw [the wallet] away" after realizing that Mr. Romero-Guardado "ha[d] no money" and that he "couldn't get in contact with [Mr. Romero-Guardado]."

Finally, viewing the evidence in the light most favorable to the verdict, a jury could interpret Mr. Alleyne's efforts to leave the scene as suggesting that he wanted to get Mr. Romero-Guardado away from onlookers to extract a payment of some kind. The bus driver implied that Mr. Alleyne drove away from the scene after realizing a camera on the bus was recording him. Once Mr. Romero-Guardado caught up with Mr. Alleyne at a gas station near the accident, Mr. Alleyne yet again refused to return the wallet unless Mr. Romero-Guardado followed him to yet

another, unknown location.  If Mr. Alleyne left the scene to, as he claimed, get out of the way of traffic, why then was he unwilling to exchange contact information once he and Mr. Romero-Guardado were safely at the gas station?  The jury could reasonably have answered that question as follows: Mr. Alleyne left the scene so that he could extract a ransom from Mr. Romero-Guardado away from the public's gaze.

Based on the above evidence, a jury could find beyond a reasonable doubt that Mr. Alleyne took the wallet intending to return it only if Mr. Romero-Guardado compensated him for the damage to his car.  And if Mr. Alleyne so intended, he possessed the requisite mental state for robbery.  The government's evidence of Mr. Alleyne's intent was accordingly sufficient to sustain his conviction.

### B.       Concurrence of Intent and Taking

Mr. Alleyne's concurrence argument targets the trial court's jury instructions—he contends that the court should have told the jury that Mr. Alleyne must have intended to steal the wallet at the moment he took it from Mr. Romero-Guardado.  We hold that, under plain-error review, the failure of the court to give the jury an instruction further emphasizing the concurrence requirement did not create a reasonable probability of a different outcome.  We therefore find no reversible error.

## 1.    Standard of review

We normally "review de novo whether challenged jury instructions adequately state the law." *Fleming*, 224 A.3d at 219.[7]  An instruction is accurate if it "clearly explain[s]" the applicable law.  *See Dawkins v. United States*, 189 A.3d 223, 237 (D.C. 2018).

We apply plain-error review to unpreserved claims of instructional error.  *See Allen v. United States*, 495 A.2d 1145, 1151 n.11 (D.C. 1985) (en banc).  The government urges us to apply plain-error review to Mr. Alleyne's concurrence argument on the ground that Mr. Alleyne did not raise the concurrence issue at trial.  After reviewing the record, we agree that Mr. Alleyne failed to preserve this issue in the trial court.

To preserve an argument of instructional error for appeal, a party must bring that argument to the trial court's attention.  Super. Ct. Crim. R. 30; *Green v. United States*, 718 A.2d 1043, 1056 (D.C. 1998).  A general objection does not suffice; the

---

[7] Mr. Alleyne suggests—perhaps against his own interest but understandably, as "our terminology has not always been entirely clear on this point," *Fleming*, 224 A.3d at 219—that this court reviews jury instructions under an abuse-of-discretion standard.  While "we review the trial court's decision to give [an] instruction for abuse of discretion," *Koonce v. District of Columbia*, 111 A.3d 1009, 1022 (D.C. 2015) (internal quotation marks omitted), "the accuracy of [an] instruction itself is a legal question that we review de novo," *Lucas v. United States*, 240 A.3d 328, 343 (D.C. 2020), if the legal question was preserved.

objection "must be specific enough to direct the judge's attention to the correct rule of law" and "be made with sufficient precision to indicate distinctly the party's thesis." *Russell v. United States*, 698 A.2d 1007, 1012 (D.C. 1997); *see also Ebron v. United States*, 838 A.2d 1140, 1147 (D.C. 2003) (noting that "the purpose behind the contemporaneous objection rule" is for a party to "put the court on notice of the objection, the reason for it, and the relief sought"). This clarity requirement, moreover, extends to a proposed replacement instruction. *See Zeledon v. United States*, 770 A.2d 972, 976 (D.C. 2001) (noting that there are "certainly limits to the judge's duty to 'get it right' despite a mistaken proffer by the defense of what an instruction should be"). Ultimately, an objection must "fairly apprise[ ]" the trial court of the party's position and the correct legal principle. *Evans v. United States*, 304 A.3d 211, 219, 222 (D.C. 2023).

Mr. Alleyne never asked the trial court to specify to the jury at what time Mr. Alleyne's intention to steal needed to arise.[8] Nor did Mr. Alleyne's trial counsel

---

[8] Although the transcript contains some references to a concurrence requirement, the thrust of the argument made by Mr. Alleyne was that the instructions for theft—*unlike* those for robbery—did *not* require concurrence. Mr. Alleyne therefore never flagged to the trial court a concern that the trial court's robbery instructions failed to communicate a concurrence requirement. In fact, his arguments regarding theft suggested the opposite.

make other objections that should have brought the issue to the trial judge's attention. So, Mr. Alleyne forfeited this argument.

The plain-error test imposes a "formidable" burden on appellants who advance unpreserved claims. *Hunter v. United States*, 606 A.2d 139, 144 (D.C. 1992). Our review has four prongs. An appellant must show that (1) the trial court erred; (2) the error was "obvious or readily apparent, and clear under current law"; (3) the error affected their substantial rights; and (4) "either a miscarriage of justice, that is, actual innocence; or that the trial court's error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Griffin v. United States*, 144 A.3d 34, 37 (D.C. 2016) (internal quotation marks omitted and alteration in original). Because we reverse a conviction "[o]nly if all four prongs are met," we need only hold that Mr. Alleyne failed to satisfy one to dispense with his argument. *Id.*

### 2. Discussion

We assume without suggesting that there was error and it was clear, and affirm the trial court pursuant to prong three: effect on substantial rights. Under this prong, we affirm unless the defendant shows a "reasonable probability of a different outcome but for the established error." *Keerikkattil v. United States*, 313 A.3d 591, 605 (D.C. 2024) (internal quotation marks omitted). We conclude that the failure of

the court to give a jury instruction further emphasizing the concurrence requirement did not create a reasonable probability of a different outcome. This is true for two reasons: (1) the instructions as provided already communicated—at least, to a degree—the requirement of concurrence and (2) the record reveals strong evidence that Mr. Alleyne possessed the required mental state at the time he took Mr. Romero-Guardado's wallet.

Again assuming that concurrence is required, the trial court's charge to the jury referenced just such a requirement. The trial court told the jury that "the [g]overnment must prove beyond a reasonable doubt . . . that . . . [Mr. Alleyne] took the property without right to it and intending to steal it." The natural reading of this instruction requires concurrence: the adverbial participle "intending" expresses the condition of the taker (Mr. Alleyne) in the moment of the taking.

To see this point clearly, one need only remove the intervening phrase "without right to it." The instruction would then read: "the government must prove beyond a reasonable doubt that Mr. Alleyne took the property intending to steal it." We are hard-pressed to assign to this instruction any meaning but the following: "when Mr. Alleyne took the property, he must have intended to steal it." And that is the concurrence requirement for which Mr. Alleyne advocates. The trial court,

therefore, did not omit mention of the concurrence requirement from its charge to the jury.

Mr. Alleyne, when confronted with this language at oral argument, suggested that the trial court should have given still greater emphasis to the concurrence requirement. But after reviewing the evidence presented at trial, we are unpersuaded that greater emphasis would have made any difference. As discussed in our sufficiency analysis, the evidence that Mr. Alleyne in fact intended to conditionally deprive Mr. Romero-Guardado of the wallet at the time he took it was strong. *See supra* Section II.A.2. And where evidence related to the challenged element of an offense was "strong," we have declined to find plain error. *See, e.g.*, *Hall v. United States*, 383 A.2d 1086, 1090 (D.C. 1978). We do so again here.

## C. Duration of Deprivation

One claim of instructional error remains. According to Mr. Alleyne, the trial court erred by failing "to modify the [pattern] instruction to explain th[at] intent to steal meant the intent to permanently deprive." Mr. Alleyne suggests that the instructions' ambiguity in this regard was heightened by their use of the phrase "to steal," which, in his view, would allow a jury to convict so long as it found that he took the wallet without permission, even if he only intended to keep the wallet temporarily. We again conclude that Mr. Alleyne did not preserve this argument in

the trial court. And, under plain-error review, Mr. Alleyne again cannot show that any error in this regard affected his substantial rights. So, reversal is not warranted.

### 1. Standard of review

Mr. Alleyne did not fairly apprise the trial court of the argument he now advances. To be sure, he asked for "the specific intent language [to] be added to the robbery [instructions]. . . . Right now it just says intending to take it."[9] But the meaning of the phrase "specific intent" is widely regarded as ambiguous. *See* Criminal Jury Instructions for the District of Columbia, No. 3.100 (5th ed. 2024) (describing how its drafters "generally chose[ ] to avoid" references to "specific intent," deeming the phrase "more confusing than helpful to juries"); *see also Carrell v. United States*, 165 A.3d 314, 323-24 (D.C. 2017) (en banc) (noting that we have "previously expressed concern about the use of 'general' and 'specific' intent," as we prefer "more precise gradations of mens rea"). And nowhere did Mr. Alleyne explain that he understood "specific intent to steal" to incorporate "a specific intent to deprive permanently."[10] Instead, when the trial court informed Mr.

---

[9] When the trial court asked Mr. Alleyne to clarify "what [he was] asking for," Mr. Alleyne in substance repeated his initial objection: "I would ask that he took the property without right with specific intent to steal it."

[10] This conclusion is reinforced by the trial court's statements during the above back-and-forth. The court made clear that, in its view, robbery required an intent to permanently deprive; indeed, it said, "in both [theft and robbery,] the [g]overnment

Alleyne that the instructions already stated that Mr. Alleyne must have "intended to steal" property, Mr. Alleyne raised no further objection. Accordingly, Mr. Alleyne forfeited his final argument, and we review for plain error.[11]

### 2.    Discussion

We assume without suggesting that there was error and it was clear, and affirm the trial court based on the absence of a likelihood that that error affected the jury's verdict. Mr. Alleyne has not shown an effect on his substantial rights for two reasons. First, the trial court's instructions, when read as a whole, arguably communicated the very instruction Mr. Alleyne now contends was omitted: intent to temporarily deprive is not sufficient. Second, because of the strength of the evidence suggesting that Mr. Alleyne in fact intended to hold Mr. Romero-Guardado's wallet

---

would be required to prove an intent to permanently deprive the person of the property." That statement suggests that had Mr. Alleyne raised the argument that he now raises on appeal, the trial court would have been receptive to supplementing the instructions. The fact that the trial court made no change in response to the objection, by contrast, indicates that the court did not understand the objection as raising the issue of permanent deprivation.

[11] The government urges us to go beyond forfeiture and find waiver—i.e., "an intentional relinquishment or abandonment of a known right or privilege." *Allen*, 495 A.2d at 1151 n.11 (internal quotation marks omitted). Because—as we conclude below—no plain error occurred, we need not address whether Mr. Alleyne waived his argument.

for ransom, we are unpersuaded that a more specific instruction would have created a reasonable probability of a different outcome.

Our first conclusion rests on a comparison of the mens rea requirements—as stated in the District of Columbia's pattern criminal jury instructions—of two charged offenses: theft and robbery. We feel comfortable relying in part on this comparison again for two reasons: one legal and one grounded in the specific instructions delivered in this case.

First, the legal justification. Our precedent makes clear that we do not analyze jury instructions in isolation but instead consider "the instructions in their entirety." *Buskey v. United States*, 148 A.3d 1193, 1205-06 (D.C. 2016) (internal quotation marks omitted); *see also Carter v. United States*, 475 A.2d 1118, 1125 (D.C. 1984). Indeed, courts assess an allegedly erroneous instruction not only in the context of the instructions, but also with respect to the trial record as a whole. *See Waddington v. Sarausad*, 555 U.S. 179, 191 (2009). And when engaging in this analysis, we have concluded that a jury confronted with an allegedly erroneous instruction would have reached the correct interpretation based on a further instruction that, although located in a separate portion of the trial court's charge, was nevertheless clearly connected to the challenged instruction. *See Buskey*, 148 A.3d at 1208 (noting that, although the "trial court's supplemental instruction was limited to the question posed

about armed robbery," it "implicitly informed the jury that the same legal principle applicable to robbery while armed also applied to burglary while armed and kidnapping while armed").

To be sure, the determination as to whether a jury would forge a logical connection between separate but related instructions is highly fact-specific. That brings us to our second justification: the nature of the instructions given in this case. From the beginning of the offense-specific instructions, the trial court informed the jury that robbery and theft were related; it said that it was "going to instruct [them] on [robbery] and also on the lesser included offense of second degree theft."[12] It emphasized the connection between theft and robbery by instructing the jury to consider theft of the wallet only if they found Mr. Alleyne not guilty of robbery of the wallet.[13] This connection was underscored still further by the high degree of similarity between the elements of theft and robbery as communicated by the trial court. Finally, second-degree theft—unlike the other crimes the jury was asked to consider—was not identified by the trial court as a separate count but instead subsumed within count one (robbery). Viewed together, the above considerations

---

[12] The trial court again highlighted this relationship as it turned to theft from robbery: "Alright. The lesser included offense of second degree theft."

[13] Robbery and theft were the only offenses for which the trial court provided such an order of operations.

persuade us that the jury—even if it did not understand the precise definition of "lesser-included offense"—would have read the robbery instructions in light of those delivered with respect to second-degree theft.

We now turn to a comparison of the trial court's theft and robbery instructions. The trial court delivered pattern robbery and theft instructions to the jury back to back.[14] The intent-related robbery instructions read to the jury informed them that, to convict Mr. Alleyne of robbery, "[i]t [was] necessary that Mr. Alleyne intended to deprive Mr. Romero-Guardado of his property and to take it for his own use." It is true that the robbery instructions did not define "intent to deprive." But the trial court instructed the jury immediately thereafter regarding "[t]he lesser included offense of second degree theft," which could also be proven by showing an "inten[t] . . . to deprive."[15] And this time, the trial court offered a more specific definition:

---

[14] Although the District's "widely used" form instructions provide a helpful guide, they are "not the law." *Lucas*, 240 A.3d at 343 n.12 (internal quotation marks omitted). Use of pattern jury instructions, therefore, does not provide a sure safeguard against error.

[15] The District's pattern instructions for theft could be read to contemplate liability even where an intent to deprive is lacking. Criminal Jury Instructions for the District of Columbia, No. 5.300 (5th ed. 2024) (stating that the defendant must "*either* [intend] to deprive . . . *or* [intend] to take or make use of the property . . . without authority or right" (emphasis added)). As the issue is not before

> To intend to deprive another of property means to intend to withhold the property or cause it to be withheld from a person permanently or for such an extended period or under such circumstances that the Defendant acquires a substantial portion of the property value. It may also mean to dispose of the property or to use or deal with the property in such a way as to make it unlikely that the owner will recover it.

Looking at the instructions as a whole, we conclude the jury was adequately informed of the definition of "intent to deprive" for purposes of evaluating whether Mr. Alleyne was guilty of robbery. This conclusion follows from the above-discussed close relationship between the theft and robbery offenses, their physical and temporal juxtaposition in the written and oral instructions, and the fact that the instructions for both offenses expressly referenced an intent to deprive. We see little likelihood that the jury would have concluded that robbery, despite being a more serious charge than theft, incorporated a less-demanding definition of "intent to deprive."

Why is this conclusion important? The trial court's specific definition of "intent to deprive" communicated exactly that which Mr. Alleyne contends was omitted—one who intends only to temporarily deprive someone of property cannot be found guilty of robbery. Under the relevant instruction, to intend to deprive

---

us, we express no opinion on whether that portion of the pattern instruction accurately reflects the law.

someone of property, a defendant must intend to withhold it either "permanently," "for such an extended period . . . that the Defendant acquires a substantial portion of the property value," or in such a way that the owner is unlikely to ever recover it. Implicit within these three alternatives is the concept of long-term—one might say "permanent"—deprivation. If, as our above analysis indicates, the jury heard the message Mr. Alleyne wanted them to hear and still convicted him, we are hard-pressed to find harm to Mr. Alleyne's substantial rights.

We note also that the evidence presented in this case strongly suggests that Mr. Alleyne possessed the intent to hold Mr. Romero-Guardado's wallet for ransom, i.e., to deprive Mr. Romero-Guardado conditionally. *See supra* Section II.A.2. Moreover, the government encouraged the jury to convict not on a theory of temporary deprivation, but instead on a theory of permanent or conditional deprivation; during closing arguments, the government stated that Mr. Alleyne either "took [the wallet] to use whatever money was inside the wallet or he took it to try and get [Mr. Romero-Guardado] to follow him to extract some kind of payment out of him off scene." *See Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973) (noting that claims of instructional error must be assessed in the context of, among other things, the "argument[s] of counsel"). Here, our above analysis of the instructions, the strength of the evidence of the requisite intent, and the context in which the government presented that evidence together convince us that no plain

error occurred. Accordingly, we decline to reverse Mr. Alleyne's conviction based on his final claim of instructional error.

### III. Conclusion

We find sufficient evidence to convict Mr. Alleyne of robbery, no plain instructional error with respect to concurrence, and no plain error in the instructions that defined the duration for which Mr. Alleyne must have intended to deprive Mr. Romero-Guardado of his wallet. We therefore affirm Mr. Alleyne's conviction.

*So ordered.*